[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action to dissolve the marriage of the parties on the ground of irretrievable breakdown. The plaintiff was represented by legal counsel. The defendant appeared pro se. The parties presented evidence September 19, 2002.
The more credible evidence leads to the following factual findings. The plaintiff, whose maiden name was Anna Bungre, and the defendant married June 3, 1978, at Fairfield, Connecticut. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There is one minor child issue of the marriage, to wit: Kristina Magura, born November 28, 1984. No other minor children have been born to the wife since the date of the marriage. The parties' older child, Kimberly Magura, was born May 3, 1982, and has therefore attained the age of majority. Neither party nor the children have received financial support during the marriage from the State of Connecticut or any municipality thereof. The marriage of the parties has broken down irretrievably.
The plaintiff wife is 43 years old and has a high school education. At the outset of the marriage the plaintiff worked at a pizza place as a waitress, then at a Pathmark supermarket as a clerk. She stopped working outside the home when she became pregnant with the parties' first child. From 1982 to 1995, the plaintiff did not work outside the home except for a brief stint at Stop Shop when the children started school, and part-time work as a lunch room aide at her daughters' school. It was the mutual agreement of the parties that the defendant's income was sufficient to support the family so that the plaintiff could be a full-time homemaker when the children were young.
The plaintiff took a part-time job at Spectrum Associates, Inc. in 1995. Within a year, she became a fulltime employee. Initially she worked in assembly, then as a solderer. About a year ago, the plaintiff left Spectrum for employment soldering for a different company. That job lasted CT Page 12208 only two months before the plaintiff returned to Spectrum as a quality control inspector. Her income is approximately $30,700 per year. The plaintiff's health insurance through her employment covers both parties and their two children at this time.
The plaintiff began contributing to a 401(k) plan at Spectrum in July, 1999. Its present value is approximately $2,200. She has no other retirement assets in her name. The plaintiff is in good health.
The defendant husband is 48 years old and has a high school education. The defendant began work as a materials handler in 1978, one month before his marriage to the plaintiff. He later worked as an expediter and then a planner. This work was for a succession of corporations that merged and were acquired in an unbroken line leading to Allied Signal as the defendant's employer. When Allied Signal moved out of this area in February, 1998, the defendant was laid off. The defendant believes that he is entitled to a pension of $600 per month from Allied Signal when he attains the age of 65. Receipt of the pension payments is not a certainty because of the financial woes of Allied Signal and possible misuse of pension monies. The lawsuits and prosecutions relating to this matter are still waxing and waning in various courts.
Upon leaving Allied Signal, the defendant took some computer courses and received a certificate of completion, but no formal degree. He collected unemployment compensation until his eligibility expired. Then he obtained work at Security Professionals LLC, where his wages were substantially less than he had been earning at Allied Signal. In June, 2001, Security Professionals was taken over by ABT Security Services and the defendant was soon again out of work. Because the defendant did not seek other employment immediately, he was found ineligible for unemployment compensation benefits. When the defendant decided he must seek employment, he was faced with the economic downturn occasioned by the events of September 11, 2001. In the immediate past several months, the defendant has not been seeking employment. At the outset of the trial, the defendant stipulated that he has an earning capacity equivalent to what he earned at Security Professionals — $33,033 per year. This is $635.25 gross per week, $498.75 net per week.
At one time during the marriage the defendant owned his own baseball card and sports memorabilia business. He had begun as a collector as a young boy. Although he ceased the business some years ago, he retains a collection of approximately 20,000 baseball cards, one Joe Nameth football card, and assorted sports memorabilia. The defendant neglected to put this asset on his financial statement for the dissolution proceedings because he believed that his starting of his collection prior CT Page 12209 to the marriage exempted this asset from consideration as a marital asset. Neither party chose to, or was able to, assign a value to the defendant's collection at trial despite the prodding of the court. It appears that much of the collection was accumulated during the marriage. The defendant now manages sales of sports cards owned by another person at a commission of 20 percent on the sales. He realizes $138.85 per week gross on these commissions.
The defendant has had a bulging disc problem in his lower back since the mid-1980's. In addition, he has a similar problem in his upper back since tumbling down a flight of stairs four or five years ago. In all other respects, his health is good.
Both parties describe their daughters as "good girls", who are steady and reliable and who cause no undue anxiety to their parents. The older daughter, Kimberly, is now twenty years of age and attends Western Connecticut State University; the younger daughter, Kristina, is now seventeen years old and is a freshman at Southern Connecticut State University. The plaintiff has paid college expenses for the children or has cosigned loans for their tuition, room and board. Since he moved out of the marital residence at the beginning of July, 1999, the defendant has not provided child support or higher education support for the children.
The relationship of the parties has been volatile. The parties' arguments were loud and sometimes violent. In the first two years of the marriage, the defendant was the primary aggressor. The plaintiff required medical treatment for an injury to her back caused by the defendant. Another time he hit her in the face. When the children were born, the violence lessened, but verbal abuse continued. On later occasions, the defendant grabbed the plaintiff by the throat or the arm, punched a hole in the kitchen wall, broke furniture and threw dishes. The plaintiff acknowledges that on some occasions, especially in recent years, she may have been the first to bring physical violence to the parties' arguments. Perhaps the most serious injury inflicted by the plaintiff upon the defendant was a push down the cellar stairs four or five years ago. It appears that the defendant's upper back disc problem relates back to that incident. The plaintiff also acknowledged that she occasionally withheld sexual contact from her husband during the marriage as a weapon.
Until July, 1999, the defendant worked long hours, including frequent overtime, in order to provide for the family. The plaintiff managed household expenses with frugality. When she became employed full-time at Spectrum in January, 1996, the plaintiff contributed substantially to CT Page 12210 payment of household bills. At the time of the parties' separation in July, 1999, they owned a residence at 1 North Star Drive, Seymour, Connecticut with no mortgage or other encumbrances. They also had more than $53,000 in the bank. The defendant had a tax-deferred savings investment at Galaxy Funds; in November, 2001, the defendant cashed out the Galaxy Fund account, netting $13,168 after taxes. Neither party had any substantial debt at the time of the separation.
The defendant's vacating of the North Star Drive house in July, 1999, followed a non-violent argument of the parties. The separation was not a surprise to either party. They had discussed separation and reached a partial agreement as to a division of their income and assets prior to the split. They refined the oral agreement shortly after the defendant moved out. Essentially, the plaintiff was to take sole ownership of the marital home and the proceeds from the parties' last joint income tax refund while the defendant would retain the bank account, the Galaxy Funds account, and his pension. The defendant would pay no child support or alimony. At the time of the separation both parties considered this settlement of their finances to be fair and equal.
The parties adhered to the agreement. The defendant took $50,000 of the joint savings and purchased a house at 52 Little River Drive, Naugatuck. The purchase price was $112,000 and the mortgage was originally about $62,000. The defendant has paid no child support. The parties stipulated to the fact that child support from July, 1999, through November, 2002, would have been $20,016.40. This amount is based upon two children from July, 1999, to May 3, 2000, and one child from May 3, 2000, to November 28, 2002, and is further based upon the actual earnings and earning capacities of the parties. In addition, the defendant has not contributed to payment of the children's medical insurance and unreimbursed medical expenses totaling $2,236 since the separation. The plaintiff alone has undertaken the expenses for the first two years of the older daughter's college education plus the first semester of that daughter's third year and the younger daughter's first year. Much of the plaintiff's current credit card debt is attributable to the children's college education expenses.
After the separation, each party had in mind a possible reconciliation. They dated on and off through the summer of 2000. Thereafter, they continued to talk periodically, but spent less time together. In the spring of 2001, the plaintiff discovered that the defendant now had a girlfriend. The plaintiff reacted with jealousy. The plaintiff immediately arranged to spend $8,000 on cosmetic surgery. The defendant cosigned a home equity loan at Fleet Bank to pay for the surgery. The plaintiff also acquired a boyfriend of her own. The CT Page 12211 defendant learned of the boyfriend in September, 2001 and also reacted with jealousy.
When divorce proceedings started in February, 2002, each party began to question the fairness of the oral separation agreement. The plaintiff had paid three years of premiums on the defendant's life insurance ($1,082.40). She also had paid some of the defendant's auto insurance and car property taxes (about $460). The plaintiff was miffed that the defendant had failed to reimburse her for these expenditures. The defendant also had grievances. For example, when an automobile titled in the defendant's name was in the care of the plaintiff, the car was hit by a snowplow. The plaintiff did not share with the defendant the settlement check in the amount of $900.
Neither party brought significant assets into the marriage. The parties held the following assets and debts at the time of the hearing on the dissolution of their marriage:
A. Plaintiff's Assets
1. 1988 Ford Escort — $1,000
2. 2001 Pontiac Sunfire — $2,000 equity
3. Fleet checking/savings account — $1,340
4. Spectrum Associates 401(k) — $2,200
5. Miscellaneous furnishings, jewelry, etc.
B. Defendant's Assets
 1. 52 Little River Drive, Naugatuck (residence) — $96,304 equity
2. 1992 Pontiac GrandAm — $3,400
3. 1968 Pontiac — $200
 4. Baseball card and sports memorabilia collection — Unspecified value
5. Naugatuck Savings Bank checking account — $172
 6. Main Street Members Credit Union savings account CT Page 12212 — $135
7. Allied Signal pension — $600 monthly at age 65
 8. First International term life insurance policy, face amount $50,000 or $100,000 — no cash value
9. Miscellaneous furnishings.
C. Joint Assets
 1. 1 North Star Drive, Seymour (residence) — $159,000
D. Plaintiff's Debts
1. ATT Universal card — $7,200
2. Chase MasterCard — $3,140
3. Citi Platinum card — $2,335
4. MBNA Platinum card — $1,079
E. Defendant's Debts
None
F. Joint Debts
1. Fleet home equity loan — $7,200
The court has considered the criteria of General Statutes §§ 46b-56,46b-81, 46b-82 and 46b-84. The court has also reviewed with care the parties' requests for relief and the parties' original idea as to a fair division of financial issues as expressed between them in their initial oral agreement. The following orders shall issue:
 1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
 2. The parties shall have joint legal custody of the minor child Kristina. Primary residence shall be with the plaintiff. The defendant shall have CT Page 12213 reasonable, flexible and liberal rights of visitation.
 3. Although the Guidelines call for the defendant to make a weekly child support payment in the amount of $114, the court is ordering that the defendant shall be relieved entirely of the child support obligation from this date until the child's eighteenth birthday. The cause for this deviation is the coordination of total family support, in particular the awarding of the Seymour residence entirely to the plaintiff. In addition, the child is subject to special circumstances in that she is already attending college and will be eighteen years of age in less than two months.
 4. The plaintiff shall maintain medical and dental insurance for the benefit of the minor child at her own expense as available to her through her employment. The provisions of General Statutes § 46b-84 (e) shall apply. The plaintiff shall be solely responsible for the cost of any unreimbursed medical and dental expenses during the minority of the child.
 5. Neither party is awarded spousal support. Each party shall be responsible for his or her own health care in the future.
 6. The plaintiff is awarded sole ownership of the current First International term life insurance policy on the life of the defendant. The plaintiff may continue or cancel the policy at her own discretion. She may change the beneficiary and may exercise all other powers resting in the ownership of the policy without the need for any permission or approval from the defendant.
 7. The sole ownership of the residential property at 1 North Star Drive, Seymour, Connecticut is awarded to the plaintiff. She shall indemnify and save harmless the defendant as to all costs and expenses relating to that real property, including but not limited to, the Fleet home equity loan. The plaintiff shall be responsible at her own expense CT Page 12214 for preparation of a quitclaim deed to be executed forthwith by the defendant.
 8. The sole ownership of the residential property at 52 Little River Drive, Naugatuck, Connecticut is awarded to the defendant. He shall indemnify and save harmless the plaintiff as to all costs and expenses relating to that real property.
 9. The plaintiff shall retain sole ownership of her Spectrum Associates 401(k) account. Any rights or claims of the defendant to that 401(k) asset are hereby extinguished.
 10. The plaintiff, as alternate payee, is awarded 50 percent of the defendant's pension at Allied Signal and its successors and assigns. Until such time as the said pension is in payment status with the defendant as participant, the plaintiff shall be designated the sole survivor of the participant on the pension plan. The Qualified Domestic Relations Order shall be prepared and submitted to the plan administrator by the plaintiff at her expense. The defendant shall provide to the plaintiff the name and address of the plan administrator and the correct name of the pension plan on or before October 31, 2002. The court shall retain jurisdiction for review and approval of the Qualified Domestic Relations Order.
 11. The defendant shall retain sole ownership of the baseball cards and sports memorabilia collection.
 12. Each party shall retain all other motor vehicles, bank accounts, furnishings, jewelry and other tangible and intangible assets now in his or her own possession.
 13. Each party shall be solely responsible for debts showing on his or her own financial affidavit submitted to this court for the final hearing on this dissolution of marriage and shall indemnify and save the other party harmless thereon.
 14. After the appeal period has elapsed for this CT Page 12215 judgment and if no appeal has been taken by either party, the defendant's Exhibits F and G (photograph of the children and wedding album/photo) may be released to the defendant at the courthouse without the need for further court order.
Winslow, J. CT Page 12216